IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| WILLIAM BANKS, *et al.*,    )<br>)<br>Plaintiffs,    )<br>)<br>UNITED STATES OF AMERICA,    )<br>)<br>Plaintiff-Intervenor,    )<br>)<br>v.    )<br>)<br>ST. JAMES PARISH SCHOOL BOARD, *et al.*,)<br>)<br>Defendants.    )<br>_____)  | Civil Action No. 2:65-cv-16173<br><br>SECTION F<br><br>MARTIN L.C. FELDMAN |

## UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION FOR A SCHEDULING ORDER AND REQUEST FOR DISCOVERY

Plaintiff-Intervenor the United States of America ("the United States") hereby responds to the August 15, 2020 motion of Defendant St. James Parish School Board ("the District"), Record Document ("R.Doc.") 154, seeking the Court's approval of a proposed scheduling order, R. Doc. 154-1, that would require the United States and Plaintiffs Willie Banks, *et al.* ("Private Plaintiffs") (collectively the "Plaintiff Parties") to respond to the District's Motion for Unitary Status and Judgment of Dismissal Regarding Faculty Assignment, Staff Assignment, Student Assignment, and Facilities ("Unitary Status Motion"), R. Doc. 153, by September 8, 2020. For the reasons set forth below, the Court should decline to enter the District's proposed briefing schedule for the Unitary Status Motion and afford Plaintiff Parties an opportunity to investigate recent serious allegations that the District discriminated against African-American students in class assignments and retaliated against an African-American employee for reporting this discrimination. The United States respectfully requests that the Court issue a scheduling order

that gives Plaintiff Parties at least ninety days to take discovery regarding these allegations,[1] and sets the deadline for the Plaintiff Parties' response to the District's Unitary Status Motion thirty days after that discovery has concluded.[2] A proposed order to this effect is being filed simultaneously as Exhibit 1 to this Response.

This proposed schedule would permit the Plaintiff Parties and the Court to determine if the District has complied with its desegregation obligations regarding student assignment, faculty, and staff in "good faith," as its pending motion asserts, R. Doc. 153 at 1, or whether it has engaged in racial discrimination against its African-American employees or students such that a declaration of unitary status would be improper under the case law. This proposed schedule also promotes judicial economy. The United States' response to the Unitary Status Motion may ultimately consent to dismissal of one or all of the remaining factors in the case if discovery confirms the District's representations that it has acted in good faith and no longer discriminates with respect to student assignment, faculty, or staff. The requested period of discovery also will help the Parties and the Court determine if a hearing on the Unitary Status Motion is necessary.

## I.     PROCEDURAL BACKGROUND

Private Plaintiffs initiated this school desegregation case on December 15, 1965, and the United States intervened on January 18, 1966. On January 30, 2017, the Court approved a Consent Decree, R. Doc. 128, requiring the District to take remedial measures in the six areas of school

---

[1] The United States proposes that the scheduling order initially provide discovery for ninety days, with leave to seek additional time if it becomes necessary due to the current circumstances—including to accommodate any logistical challenges facing the District as it resumes school operations amid the COVID-19 pandemic.

[2] Private Plaintiffs have informed the United States that they concur in this schedule and intend to file their own request to that effect with the Court shortly.

operations known as the *Green* factors: 1) student assignment, 2) facilities, 3) faculty, 4) staff assignment, 5) discipline, and 6) extracurricular activities. *See Green v. School Bd. of New Kent Cty.*, 391 U.S. 430, 435 (1968).

The Consent Decree was to stay in effect for at least three years, Consent Decree ¶ 56, and required the District to report on its compliance with its desegregation obligations each year in February and October, *id.* ¶ 48. This reporting aimed to create the three-year record of "full and good faith compliance" needed to achieve unitary status in each area of the Consent Decree. *See id.* ¶ 56. For example, to ensure nondiscrimination within the District's schools, the Consent Decree requires the District to report the racial composition of each class in each school, and "whether any students in the class are grouped or assigned by race, ability, achievement, language needs, or another basis." *Id.* ¶ 48(c). The Consent Decree also requires the District to disclose any complaints "alleging that a student was discriminated against because of the student's race/ethnicity" or "alleging that a faculty or staff person was discriminated against" based on race, and to produce "any documents related to the investigation and resolution of such complaints." *Id.* ¶ 48(g). The Consent Decree further provides that the Plaintiff Parties "may request additional documents and data" and "conduct other reasonable activities necessary to monitor [its] implementation." *Id.* ¶ 49.

The Consent Decree also sets forth the process for the Parties to follow when the District believes it has satisfied its obligations as to one or more *Green* factors and therefore should be awarded unitary status. *Id.* ¶ 56. The Parties must first discuss whether the District has complied fully and in good faith as to a particular *Green* factor, and if there is agreement, jointly move for unitary status with respect to that factor. *Id.* If the Parties cannot reach agreement, the

Consent Decree provides that the "District may seek a scheduling order from this Court for a determination that it has achieved unitary status in particular *Green* factors." *Id.* In keeping with this process, the Parties previously agreed that the District had satisfied its obligations with respect to extracurricular activities, and on July 17, 2017, the Court declared the District unitary in that *Green* factor. July 17, 2017 Order & Judgment, R. Doc. 132.

In December 2019, the District first raised with Plaintiff Parties its desire to move for unitary status on additional *Green* factors, including those that are the subject of the current Unitary Status Motion.[3] Plaintiff Parties responded that they were willing to discuss whether the District had achieved unitary status in those areas, and on December 23, 2019, Private Plaintiffs requested documents to evaluate the status of the District's compliance. From December 2019 to February 2020, the District continued to express a desire to move for unitary status, but did not provide the documents requested by Private Plaintiffs, as required by the Consent Decree. *See* Consent Decree ¶ 49. Private Plaintiffs informed the District that they could not discuss unitary status further until they had received the outstanding documents.

The Consent Decree required the District to provide Plaintiff Parties a status report by the first business day after February 15, 2020, but the District missed that deadline. *See id.* ¶ 48. When the United States inquired about the status of the report on February 27, 2020, District counsel responded that she would have to check about the status, but the District did not provide the report or any further updates. On March 6, 2020, Private Plaintiffs asked the District about the status of the documents Private Plaintiffs had requested in December 2019, which included

---

[3] The original discussions included the discipline portions of the Consent Decree, but that portion of the Consent Decree is not included in the Unitary Status Motion. *See* Def.'s Mot. for Unitary Status and Judgment of Dismissal, R. Doc. 153 at 2, n.1 ("The only other obligations from the 2017 Consent Order relate[] to discipline, which has separate and distinct obligations from every other area of operation.").

4

information required in the February status report, and offered to discuss the District's desire to move for unitary status when those documents were provided. The District did not provide the requested documents and the Parties did not resume discussions regarding unitary status.

In April 2020, out of respect for the impact of public health challenges on the District's operations, the United States put on hold its efforts to obtain the overdue status report. The United States did not hear from the District about this matter until June 23, 2020, when the District submitted its status report. This report included the requisite enrollment data by race for each class in each school, identifying a few classes as gifted and talented. *See id.* ¶ 48(c). This report did not include any complaints alleging that the District had discriminated against students or employees on the basis of race, nor had any of the District's prior reports. *See id.* ¶ 48(g); Def.'s Ex. A, Attachs. 1-7, R. Docs. 153-3 – 153-11.

In the meantime, in early May 2020, the United States learned from news reports that a former African-American employee had filed a federal lawsuit against the District that raised the very type of allegations that the District must report under Paragraph 48(g) of the Consent Decree because they are directly relevant to a school desegregation case. Specifically, the employee, who had worked in the District as a school psychologist until late 2019, alleged that the District intentionally discriminated against African-American students in classroom assignments, including in the assignment of students to general education classes, the selection of students for gifted and talented programs, and the identification of students for special education services. Cuebas Compl. at 4-5 (Ex. 2 to U.S. Response). The lawsuit also alleged that the District retaliated against the employee for complaining about this discrimination by creating a racially hostile environment for her that led to her constructive discharge via her

5

resignation.  *Id.* at 9-10.

The United States promptly conducted initial due diligence regarding the former employee's allegations to assess if they were credible, and carefully reviewed data about the assignment of students to classes in the status report produced on June 23, 2020.  On July 16, 2020, the United States notified the District in writing of a pattern of significant differences in the racial composition of several sections of the same course at the same school, differences that seemed too large to be the result of random probability, and gave the District a number of examples of this racially suspect pattern.  As provided for in Paragraphs 48(c) and 49 of the Consent Decree and in keeping with the Parties' past practice of successfully resolving issues through informal discovery, the United States requested that the District explain how it assigns student to classes and describe any basis (such as parent/student requests or differences in the rigor of courses) that might explain the identified racial disparities.  *See* Consent Decree ¶ 48(c) (requiring District to report "whether any students in [any] class are grouped or assigned by race, ability, . . . or another basis"); *id.* ¶ 49.  On July 24, 2020, Private Plaintiffs sent a letter to the District raising similar concerns about the assignment of students to classes, asking about the other relevant allegations in the former employee's lawsuit, and requesting documents to evaluate those allegations.

On July 31, 2020, the District sent the Plaintiff Parties notice of its intention to file the Unitary Status Motion and gave the Plaintiff Parties one week to take a position on that motion.  The District did not provide any information in response to the Plaintiff Parties' July letters, but promised to do so early the following week.

On August 12, 2020, the Parties held a call to discuss the District's Unitary Status

Motion.[4]  A few hours before the call, the District sent a letter to the Plaintiff Parties asserting that it did not discriminate in assigning students to classes (without answering the questions asked in the United States' July letter or providing any supporting evidence)[5] and incorrectly arguing that the remainder of the allegations in the former employee's lawsuit were irrelevant to its Unitary Status Motion.  *See* Consent Decree ¶ 48(g) (requiring District to report any complaints alleging racial discrimination against students or employees and to produce "any documents related to the investigation and resolution of any such complaints").  During the call, Plaintiff Parties urged the District to delay filing its Unitary Status Motion, because if the District were willing to provide the requested information and discuss the recent allegations and outstanding issues, this engagement might resolve the Plaintiff Parties' concerns and permit the Plaintiff Parties to consent to all or portions of the District's Unitary Status Motion.

The next day, the District rejected these efforts to resolve the outstanding issues in a collaborative fashion and informed Plaintiff Parties that it refused to engage in negotiations, provide any more information, or delay filing its Unitary Status Motion.  Moreover, the District expressed its intention to file its motion the following day (August 14) and asked the Plaintiff Parties to state their respective positions on the motion by the following afternoon.  On August 14, 2020, the United States informed the District's counsel via electronic mail that:

> The United States does not oppose the District's draft motion for unitary status on facilities. However, the United States is not prepared to consent at this time with respect to faculty and staff because, as we discussed on our call earlier this week,

---

[4] The District agreed to extend its initial deadline one week to accommodate the vacation schedule of counsel for the United States.

[5] The letter stated "Per the general injunction prohibiting discrimination, the Board has continued to implement procedures to assign students to classes on a non-discriminatory heterogenous basis and to provide equal educational opportunities to students. All assignments to special education classes are made strictly in accordance with the Individuals with Disabilities Education Act, and to gifted classes strictly in accordance with Louisiana law. Any racially unbalanced classrooms are anomalies that have occurred by chance or as a matter of scheduling needs with no intention of segregating students."

> the United States needs additional time to look into current allegations of discriminatory employment practices before we can determine if the District is unitary with respect to faculty and staff, as your draft motion contends. The United States is also not prepared to consent at this time to the District's motion for unitary status on student assignment because the District has not fully or adequately responded to questions the United States has raised about racially suspect assignments of students to classes within its high schools, and the United States needs additional information to evaluate allegations of intentional race discrimination in the District's gifted and special education programs. This information includes the outstanding information requested by Private Plaintiffs on July 24th.

Later that day, Private Plaintiffs informed the District of their opposition to the entire motion.

On August 15, 2020, the District filed its Motion for a Scheduling Order. This Motion did not inform the Court that the Plaintiff Parties had sought additional information about the allegations of racial discrimination in the lawsuit and left out much of the history regarding the Parties' communications about the District's interest in moving for unitary status.

## II.     LEGAL STANDARDS

To obtain a declaration of unitary status, the District must show that it has: 1) fully and satisfactorily complied with the Court's orders for a reasonable period of time, 2) eliminated the vestiges of prior *de jure* discrimination to the extent practicable, and 3) demonstrated a good-faith commitment to the whole of the Court's orders and to those provisions of the law and the Constitution that were the predicate for judicial intervention in the first instance. *See Missouri v. Jenkins*, 515 U.S. 70, 87-89 (1995); *Freeman v. Pitts*, 503 U.S. 467, 491-92, 498 (1992); *Bd. of Educ. of Oklahoma City Pub. Schs. v. Dowell*, 498 U.S. 237, 248-50 (1991). As the Supreme Court stated in *Freeman*, "one of the prerequisites to relinquishment of control in whole or in part is that a school district has demonstrated its commitment to a course of action that gives full respect to the equal protection guarantees of the Constitution." *Freeman*, 503 U.S. at 490. Thus,

to obtain unitary status, a school district must demonstrate not only its "affirmative commitment to comply in good faith with the entirety of a desegregation plan," but also that it has not "acted in bad faith or engaged in further acts of discrimination since the desegregation plan went into effect." *Id.* at 499.

"Because of the potential consequences," the Fifth Circuit requires "district courts to follow certain procedures before declaring a school system unitary." *Quarles v. Oxford Mun. Sep. Sch. Dist.*, 868 F.2d 750, 752 (5th Cir. 1989). This includes giving plaintiffs "an opportunity to show cause why continued judicial supervision is necessary." *Id.* Moreover, because "[p]roper resolution of any desegregation case turns on a careful assessment of is facts," *Freeman*, 503 U.S. at 474, the Fifth Circuit has looked at whether plaintiffs had the opportunity to take discovery in determining whether they had a sufficient opportunity to show why judicial supervision was necessary. *See Quarles*, 868 F.2d at 753.

### III.     ARGUMENT

The United States should be given the opportunity to take discovery regarding the recent serious allegations that the District discriminated against African-Americans in its student assignment and employment practices before being required to respond to the District's Unitary Status Motion. Discovery is particularly appropriate here given the "Legal Standards" in the Consent Decree that the Parties agreed would govern such a motion: "For each area of operation, *if the facts reveal (a) no continued racial discrimination*, (b) that the District has made good faith efforts to comply with the desegregation decree, and (c) 'the vestiges of past discrimination have been eliminated to the extent practicable,' this Court may declare that factor unitary, but retain

continuing jurisdiction over the remaining factors until unitary status is fully achieved in the remaining areas. [*Freeman*, 503 U.S.] at 491-92." Consent Decree at 4 (emphasis added).

Discovery will enable the Plaintiff Parties and the Court to determine if the facts reveal continued discrimination in the District's class assignment and employment practices, including whether the District harassed and otherwise retaliated against an African-American employee when she raised the type of complaints that the District agreed to produce. *See id.* ¶ 48(g). Such harassment and retaliation would violate the very employment policy that the Board argues evinces its good faith commitment not to discriminate against faculty and staff. *See* Def.'s Mem. in Supp. of Unitary Status Mot. at 9, R. Doc. 153-1; Board Policy GAAA, Equal Opportunity Employment Policy (Def.'s Ex. B at 2-3, R. Doc. 153-15). Without discovery, the United States will not have a meaningful opportunity to evaluate the serious allegations made by the former psychologist, and if the evidence supports her allegations that the District engaged in racial discrimination against either students or employees, to "show cause why continued judicial supervision is necessary." *Quarles*, 868 F.2d at 752.

The District's Memorandum in Support of its Unitary Status Motion ("Memorandum"), R. Doc. 153-1, illustrates why the United States should not be required to respond to the District's Unitary Status Motion without being first allowed to take discovery. In that Memorandum, the District responds briefly and in a conclusory fashion to the allegation that it discriminates against African-American students in its high school classroom assignments. The District asserts that "the Board has continued to implement procedures to assign students to classes on a non-discriminatory heterogenous basis," Def.'s Mem. at 20, and uses "fair and non-discriminatory methods to assign students to courses in its schools," *id.* at 21. In regard to one of

its high schools, the Memorandum also states that "the District must balance the educational needs, graduation requirements, class size limitations, course requests, extracurricular activities, and other factors when scheduling classes for roughly 1,000 students." *Id.*

This response, however, does not explain or sufficiently account for the significant disparities in the racial composition of different sections of the same course within the same high school that the United States identified in its July 2020 letter. For example, the United States detailed the significant disparities in the racial composition of different sections of "English 7" at Lutcher High School in the 2019-2020 school year. *See* Def.'s Ex. A, Attach. 7 at 35, R. Doc. 153-11. In one section of that course, only 24% of the students (four out of 17) were white, and in another section of that same course, only 12% of the students (two out of 17) were white, even though 52% of all students taking English 7 at Lutcher High School were white, a difference of 40 percentage points. In contrast, two other sections of English 7 were 72% and 76% white, with 18 and 19 white students respectively out of 25 total students.

To meaningfully evaluate the District's assertion that these disparities resulted from chance or considerations other than race, the United States should be given the opportunity to obtain discovery about how the District assigns students to classes. This includes the District turning over any documents that show how and why the District assigned students to particular sections of this course and other similar courses like the examples cited in the Plaintiff Parties' letters to the District. The District also should be required to identify the employees at each school responsible for assigning students to classes and give the United States the opportunity to question those employees about the circumstances that led to these classes' racial composition.

As discussed above, the United States sought this type of information but the District refused to provide it. In July, a few weeks after the District finally produced the overdue status report that revealed these class compositions, the United States requested information that would allow it to begin exploring the psychologist's allegations that the District engages in racial discrimination when assigning students to classrooms.[6] However, in its August 12 letter, the District did not fully respond to the United States' requests for information, and thereafter refused to delay its Unitary Status Motion until the United States had the opportunity to obtain all of the information necessary to evaluate the psychologist's allegations of racial discrimination in class assignments and employment.

In refusing to provide information to the Plaintiff Parties about these allegations of race discrimination, and instead rushing to file the Unitary Status Motion, the District attempts to circumvent the dispute resolution processes in the Consent Decree.[7] Up until now, the Parties have followed these processes and resolved issues without the need for judicial intervention.

Because the District refused to resolve the outstanding issues cooperatively or agree to such a process, the Court should deny the District's Motion to issue a scheduling order that would require the United States to respond to the Unitary Status Motion by September 8, 2020. The Consent Decree requires the District to seek a scheduling order when one or both Plaintiffs

---

[6] Out of respect for the health-related challenges the District faced, the United States sent a limited information request on July 15, 2020, and planned to follow up, including by interviewing District staff, at an appropriate time. Because the District had stopped pursuing discussions about unitary status and had cooperated with past requests for information authorized by the Consent Decree, the United States reasonably expected that it would have the time it needed to explore and hopefully resolve this class assignment issue before the District moved for unitary status.

[7] As discussed above, the Consent Decree gives the Plaintiff Parties the right to request information to monitor the District's progress towards unitary status. *See supra* at 3. If a plaintiff believes this information demonstrates the District's non-compliance, the Consent Decree requires the plaintiff to notify the District and attempt to negotiate a resolution before seeking relief from the Court. Similarly, as discussed above, the Consent Decree requires the Parties to discuss whether the District has achieved unitary status in a particular area before the District files a motion to that effect with the Court.

do not consent to filing a motion for unitary status to ensure that a sufficient process is in place for the Court to determine if "the facts reveal . . . [any] continued racial discrimination," Consent Decree at 4, and whether the District has "acted in bad faith or engaged in further acts of discrimination since the desegregation plan went into effect." *Freeman*, 503 U.S. at 499.  As discussed above, the law of this Circuit and basic principles of due process and fairness require giving plaintiffs an opportunity to show why continued judicial supervision is necessary before the Court entertains a motion for unitary status, and the current factual record does not yet afford the United States that opportunity.  Accordingly, the Scheduling Order should give the United States ninety days of discovery to explore the allegations of racial discrimination and supplement the record.  The Scheduling Order should not require the United States to respond to the Unitary Status Motion until thirty days after the completion of that discovery.

Affording the United States discovery and a chance to consult with the Parties before filing its response also serves the interests of judicial economy.  The District may be able to provide information in discovery that addresses the issues raised by the Plaintiff Parties—for example by showing that non-discriminatory assignment criteria explain the disparities observed in the racial composition of classes in its high schools.  In that case, the United States would be able to consent to the District's Unitary Status Motion in whole or in greater part,[8] obviating or reducing the need for contested litigation.  Finally, the District cannot argue that discovery would cause it prejudice or lead to undue delay when the procedural history cited above demonstrates that it was the District's own inaction (even if partly understandable in light of circumstances

---

[8] The United States has not objected to the District being declared unitary in facilities.

beyond its control) that led to the passage of time since it first expressed its interest in moving for unitary status in December 2019, not a lack of due diligence by the United States.

## IV. CONCLUSION

The United States respectfully requests that the Court reject the scheduling order proposed by the District, R. Doc. 154-1, and enter the accompanying proposed Scheduling Order, which: 1) grants the Plaintiff Parties ninety days to take discovery (with leave to seek additional time if the current, unprecedented circumstances so require), and 2) gives the Plaintiff Parties thirty days to file its response to the Unitary Status Motion after discovery has concluded.

Respectfully submitted,

ERIC S. DREIBAND
Assistant Attorney General
Civil Rights Division

/s/ James A. Eichner
_____
SHAHEENA SIMONS, Section Chief
EMILY H. MCCARTHY, Deputy Chief
JAMES A. EICHNER, Trial Attorney
Educational Opportunities Section
Civil Rights Division
U.S. Department of Justice
4 Constitution Square
150 M St., NE
Suite 10.1106
Tel: (202) 598-5022
james.eichner@usdoj.gov
crtedu.filings@usdoj.gov

**CERTIFICATE OF SERVICE**

      I hereby certify that on August 21, 2020, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to counsel of record.

      /s/ James A. Eichner
      _____
      JAMES A. EICHNER